# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**CHERYL HAWKINS, and**
**MICHAEL GAUGH, JR.,**

     **Plaintiffs,**

**v.**                                                                    **Case No: 5:20-cv-35-PRL**

**UNITED STATES OF AMERICA,**

     **Defendant.**

_____

### MEMORANDUM DECISION AND ORDER

Plaintiffs, Cheryl Hawkins and Michael Gaugh, Jr., filed this action for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671-2680 ("FTCA"), alleging that Defendant, the United States of America, by and through an employee of the Army, negligently operated a motor vehicle so that it collided with Plaintiffs' motor vehicle.[1] Although Ms. Hawkins and Mr. Gaugh filed suit separately, at the request of the parties, the court consolidated the cases. (Doc. 10).

I held a four-day bench trial in this case from March 21, 2022 to March 23, 2022, and April 12, 2022. The parties submitted trial briefs at the conclusion of the trial. (Docs. 62, 63).

For the reasons explained below, I find that the preponderance of the evidence establishes that both Plaintiffs sustained a cervical sprain from the accident and that judgment should be entered in favor of Ms. Hawkins in the amount of $54,329.73 and Mr. Gaugh in the amount of $5,722.66.

_____

[1] This Court has subject matter jurisdiction of this case pursuant to federal question jurisdiction (28 U.S.C. § 1331).

In accordance with Rule 52, the following constitutes the Court's findings of fact and conclusions of law.

## I.   BACKGROUND AND FACTUAL RECORD

The following facts were established at trial by a preponderance of the testimony and documentary evidence offered and admitted into evidence.[2]

### A. The Accident

On March 11, 2017, Plaintiffs Ms. Hawkins and Mr. Gaugh were traveling to Crystal River in a Chevy Silverado and hauling a 20-foot boat on a trailer to go fishing. Ms. Hawkins was driving, and Mr. Gaugh was the passenger. Ms. Hawkins had a green light while traveling westbound on State Road 326 at its intersection with County Road 25A in Marion County. While traveling through the intersection, the defendant's employee failed to yield when making a left turn and collided head on into the plaintiffs' vehicle. Upon impact, the 20-foot boat lifted off the trailer and collided with the rear of the plaintiffs' vehicle. The defense is not contesting liability.

Both Ms. Hawkins and Mr. Gaugh were wearing their seatbelts at the time of the accident. Upon impact, the airbags in the plaintiffs' vehicle did not deploy. Paramedics checked Ms. Hawkins and Mr. Gaugh at the scene of the accident, and both refused transport to the hospital. Neither ever went to the hospital after the accident. Instead, Ms. Hawkins went to the chiropractor six days later and Mr. Gaugh went to the chiropractor nine days

---

[2] Plaintiffs presented the testimony of Cheryl Hawkins, Michael Gaugh Jr., Dr. Leon, and Dr. Saatman. Defendant presented the testimony of Dr. Kaye and Dr. Rosenblatt. Official transcripts of the trial testimony have been filed with the Court. (Docs. 54, 55, 56, 60). The Court will refer to the parties' joint exhibits as "J" and Plaintiffs' and Defendant's exhibits as "PX" and "DX" followed by the appropriate exhibit number.

later. Before seeking chiropractic care, both first sought the counsel of an attorney. Neither had any complaints of pain or headaches before the accident.

At the time of the accident, Ms. Hawkins was 56 years old, and Mr. Gaugh was 20 years old. Ms. Hawkins has been training horses since 1982. For six months prior to the accident, Ms. Hawkins boarded the horses on a property she leased to own. Mr. Gaugh worked at the Ocala National Golf Course. Prior to the accident, Mr. Gaugh played golf for his middle and high school teams. He was the number one golfer on his team of seven in high school.

### B.  Ms. Hawkins' Post Accident Medical Care

Ms. Hawkins visited Dr. Leon at Vida Chiropractic on March 17, 2017, six days after the accident. She complained of headaches, neck pain, and back pain. Dr. Leon diagnosed Ms. Hawkins with acute non retractable post traumatic headaches; neuralgia and neuritis; chest pain due to trauma; cervicalgia; pain in the thoracic spine; low back pain; contracture of muscle; hyperesthesia; sprain of ligaments of cervical, thoracic, and lumbar spine; sprain of other specified parts of thorax; myositis; and sleep disorder. (J. 6, p. 384-36). Dr. Leon created a treatment plan for Ms. Hawkins to be seen three times a week for four weeks with the short-term goals of 50% reduction in symptoms, 50% reduction of pain, increased ability to perform activities of daily living, decrease inflammation, decrease muscle spasms, and increase active range of motion. (J. 6, p. 385-86).

On March 24, 2017, Ms. Hawkins visited Brandy Wiley, a physicians associate at Axxess Therapy who concluded Ms. Hawkins had a cervical spine strain/sprain, non-displaced closed fracture of the left distal phalanx on the thumb, post traumatic headaches,

and a contusion on her left leg. (J. 1, p. 98). She was given pain medication, a splint for her thumb, and offered trigger point injections for pain, which she declined.

Ms. Hawkins began the first two weeks of chiropractic care in March 2017 with five visits, and then proceeded with six visits in April 2017, five visits in May 2017, five visits in June 2017, and three visits in July 2017. (J. 6, p. 387-89). In other words, in these first four and a half months her chiropractic care was initially approximately three times a week for the first few weeks, then slightly more than once a week in May and June, and then less than once a week in July. She was reassessed on July 28, 2017 and determined to be approaching maximum chiropractic improvement. (J. 6, p. 659). At that point, Dr. Leon noted that Ms. Hawkins would continue her treatment as needed. (J. 6, p. 661).

Two months after the accident, during her early treatment with Dr. Leon, he referred Ms. Hawkins to Clermont Radiology for an MRI. The MRI was completed on May 16, 2017, and the impressions for the cervical spine stated:

1. Straightening of cervical lordosis.
2. Intervertebral discs at all the cervical levels show desiccation changes with some reduction in height at C4-C5 to C6-C7.
3. C2-C3: Mild hypertrophic changes are noted with moderate facet joints.
4. C3-C4: Disc bulge noted with moderate facet joint hypertrophic changes left worse than right indenting thecal sac causing moderate left and some right neural foramen narrowing.
5. C4-C5: Grade 1 anterior listhesis of C4 over C5 by 2mm. Broad-based posterior disc bulge noted abutting the spinal cord and causing mild to moderate narrowing of bilateral neural foramina. Facet joint arthrosis noted left worse than right.
6. C5-C6: Posterior central disc herniation noted showing annular T2 hyperintensity (tear/edema/inflammation) (acute) with asymmetrical left uncovertebral arthrosis (chronic) indenting thecal sac causing moderate effacement of left lateral recess and moderate to severe narrowing of left neural foramen.

7. C6-C7: posterior central disc herniation noted showing annular T2 hyperintensity (tear/edema/inflammation) (acute) indenting thecal sec/ No significant neural foramen narrowing.

8. On flexion MRI there is anterior listhesis of C4 over C5, which appears stable compared to neutral position scans.

(J. 2, p. 84). The impressions for the thoracic spine stated:

1. T3-T4: Posterior central and right paracentral disc bulge noted indenting thecal sac. There is no significant spinal canal, lateral recess, neural foramina compromise, or nerve impingement. It is medically probable that reported findings were caused by recent trauma/accident 3/11/2017, recommend clinical correlation with patient's symptoms and medical history.

2. Costovertebral arthrosis on left at T7, 78, and T9.

(J. 3, p. 88). The reading radiologist reported that "it is medically probable that reported findings were caused by recent trauma/accident 3/11/2017" and "recommend[ed] clinical correlation with patient's symptoms and medical history." (J. 2, p. 85). The radiologist, however, did not testify; so, we don't know what the basis for her opinion is.

After her late-July 2017 visit with Dr. Leon, Ms. Hawkins received no chiropractic treatments from him in August, September, or October 2017 – a three-month period. (J. 6, p. 657-658). Ms. Hawkins did, however, have a consultation with a neurosurgeon, Dr. Dare, in September 2017. While Dr. Dare was also not called to testify at trial (and thus provides no opinion as to causation), the medical records show that on September 29, 2017, Dr. Dare found that Ms. Hawkins failed to improve with physical therapy (presumably based on her chiropractic treatment with Dr. Leon) and "discussed the option of definitive surgical intervention to entail C4 to C7 anterior decompression and fusion with instrumentation." (J. 12, p. 3). Dr. Dare noted that Ms. Hawkins was amenable to his recommendation and return

- 5 -

to see him for further discussion. After this single consultation, however, Ms. Hawkins did not pursue any additional care with Dr. Dare, whether surgical or otherwise.

On November 8, 2017, she returned for one chiropractic visit with Dr. Leon, but then didn't return for treatment with him for a little over two months until January 17, 2018. After this visit, Ms. Hawkins testified that she sought another neurosurgeon opinion, this time from Dr. Widi, because surgery scared her and she needs a full range of motion in her neck for her profession. (Doc. 54, p. 41). Ms. Hawkins testified that she would "lose her entire business" in the three-to-six-month downtime to heal from the surgery. (Doc. 54, p. 41). According to the medical records, on January 25, 2018, Dr. Widi ordered a CT scan of the cervical spine, prescribed anti-inflammatories and muscle relaxers, and scheduled a follow up in a month. (J. 4, p. 41-42). Ms. Hawkin had a CT scan taken on January 30, 2018, and the impressions stated:

1. Straightening of cervical lordosis.
2. Mild to moderate cervical spondylosis
3. On flexion view there is grade 1 anterior listhesis of C2 over C3, C3 over C4, C4 over C5, reduced extension view
4. On extension view there is grade 1 retrolisthesis of C6 over C7, reduced on flexion view
5. No vertebral compression fracture

(J. 5, p. 150).

At the follow up appointment on February 21, 2018, Dr. Widi noted that Ms. Hawkins "improved significantly with anti-inflammatory muscle relaxers and she is not taking them on a continual basis." (J. 4, p. 44). Dr. Widi noted that the CT scan corroborated some of the MRI findings. Dr. Widi (who also did not testify and thus offered no opinion on causation) noted in the medical records that Ms. Hawkins could be a candidate for an anterior cervical discectomy at C4 to C7 or a posterior cervical decompression and instrumented fusion from

C3 down to C2, if her neck pain worsens, quality of life deteriorates, and she is unable to obtain adequate pain relief without medication. However, Dr. Widi's also noted: "given that the patient is compensating rather well right now on non-narcotic medication, I would recommend that the patient see me [as needed]." (J. 4, p. 44). Dr. Widi's records also noted that given the appearance of Ms. Hawkins' imaging, Ms. Hawkins' "ability to compensate with medication use and home exercises may not be enough to avoid surgical intervention in the long run." (J. 4, p. 44). Aside from the two visits with Dr. Widi, Ms. Hawkins did not continue treatment with him.

Mr. Hawkins returned to Dr. Leon for one additional chiropractic visit on February 21, 2018, but then went almost a full year with no chiropractic visits until resuming care on February 7, 2019. (J. 6, p. 16-17).

During this year-long gap in chiropractic care, on March 20, 2018, Ms. Hawkins sought a third opinion from a neurosurgeon. At her initial visit, Dr. McCollom reviewed her history and present conditions – including neck and back pain, her treatment with chiropractic care and Robaxin, and that overall her cervical and lumber symptoms have been improving – and asked her to provide copies of her MRI for him to review, which she did. (J. 5, 165). On May 1, 2018, her next appointment for which there is a report, Ms. Hawkins' history and symptoms are reported the same as her earlier visit (i.e., same symptoms and notation that they have been improving) and Dr. McCollom (noting that he had reviewed the MRI findings) recommended medial branch block injections at C5, C6, and C7 bilaterally. (J. 5, 163). On May 29, 2018, according to the medical records for the procedure, Ms. Hawkins received a medial branch nerve block injection from Dr. McCollom at C7 on the right side. (J. 5, p. 152). The record of this procedure shows a recommended follow-up appointment for two weeks

later, but it appears that Ms. Hawkins never returned for any further treatment with Dr. McCollom – despite his recommendation that she receive the medial branch nerve block injection at multiple levels and bilaterally. Other than this recommended treatment, Dr. McCollom's records do not reveal that he recommended surgery. Dr. McCollom also did not testify at trial.

After the single injection in May 2018, Ms. Hawkins appears to have received no medical treatment for her neck and back pain until February 7, 2019 (a little over seven months), when she returned for a chiropractic visit with Dr. Leon. She had three visits with him in February 2019, then went twice a month in March, April, and May 2019, once in June, twice in July, once in August, twice in September, once in October, and then twice in November 2019. She then received no medical care for approximately two months, then resumed care with Dr. Leon for one visit a month in January, February, and March of 2020. She had another two-month gap in care until resuming care with Dr. Leon in May 2020.

In May and June 2020 Ms. Hawkins visited with Dr. Leon twice each month. In July 2020 she had three chiropractic visits and underwent another MRI. Specifically, on July 15, 2020, Ms. Hawkins had an additional MRI taken of her spine and neck. The impressions for the cervical spine stated:

1. Straightening of cervical lordosis
2. C2-C3: Posterior disc bulge noted indenting thecal sac. Mild hypertrophic changes noted in left facet joint. New since prior MRI study and stable since prior CT study.
3. C3-C4: Anterior listhesis of C3 over C4 by 1mm. Posterior disc bulge noted indenting thecal sac. Moderate left and mild right facet joint hypertrophic changes noted causing moderate left and mild right neural foramen narrowing. Unchanged since prior MRI and CT study.
4. C4-C5: Anterior listhesis of C4 over C5 by 1.5mm. Posterior central focal disc herniation, best seen on sagittal T2 image #7/12 abutting the spinal cord. Asymmetrical left

      uncovertebral and facet joint hypertrophic changes noted causing moderate to severe narrowing of left neural foramen. Right neural foramen is patent. Unchanged since prior MRI and CT study.

5. C5-C6: Posterior central disc herniation showing annular increased signal intensity (tear/edema/inflammation), best seen on sagittal T2 image #7/12 with asymmetrical left uncovertebral and facet joint hypertrophy abutting the spinal cord and causing moderate to severe narrowing of left neural foramen. Unchanged since prior MRI and CT study.

6. C6-C7: Broad-based posterior central and left paracentral disc protrusion/herniation, best seen on sagittal T2 image #6/12 with asymmetrical left uncovertebral hypertrophic change abutting the spinal cord causing mild spinal canal stenosis, moderate effacement of left lateral recess and severe narrowing of left neural foramen. Right neural foramen is patent. There appears to be interval worsening in severity of posterior disc herniation and left neural foramen narrowing compared to prior MRI report.

7. C7-T-1: Mild to moderate hypertrophic changes noted in right facet joint.

(J. 6, p. 169-170). Notably, in the eighth impression on the report, the radiologist, who also wasn't called to testify, reported that "[o]n comparison with prior MRI report and CT study, there is interval worsening in severity of posterior disc herniation at C6-C7 resulting in mild spinal canal stenosis and increase in severity of left neural foramen narrowing," and that "[t]here is also interval development of posterior disc bulge at C2-C3." (J. 6, p. 169-170). Lastly, she reported that the "[f]indings at rest of cervical levels appear grossly stable." (J. 6, p. 169-170).

     Ms. Hawkins had a single chiropractic visit in August 2020 with Dr. Leon. Then, on August 28, 2020, she consulted with another neurosurgeon, Dr. Saatman, for a fourth opinion. Dr. Saatman, who did testify at trial, first noted that she reviewed the recent MRI studies and "reviewed that indeed there is disk injury, but based on her symptoms that she has had a brief radicular symptoms that has fully responded thus far to conservative

treatment," she felt that there was room for improvement with "further conservative management." (J. 3, p. 49). Dr. Saatman thus recommended "starting with a single cervical epidural steroid injection to address deep-seated inflammation" and explained to Ms. Hawkins that "she may require a full series of three injections." (J. 3, p. 47-52). Dr. Saatman stated in her report, after discussing that a full series of injections may be needed, that "[s]hould she still experience significant pain, we may transition to a more mechanical based approach addressing potential facetogenic pain." (J. 3, p. 47-52). And, Dr. Saatman stated in her report that she "discussed with her that indeed there is a potential pathology warranting surgical intervention," but noted that she (i.e., Dr. Saatman) is "sensitive to the fact that her (i.e., Ms. Hawkins's) livelihood is based on a very physical occupation of horse training and that three-level cervical fusion would likely end her career." (J. 3, p. 50).

After her August 2020 consult with Dr. Saatman, Ms. Hawkins had two chiropractic appointments in September, the second occurring on September 16, 2020. Then, on October 29, 2020, Dr. Saatman administered a single cervical epidural steroid injection, which Ms. Hawkins tolerated well. (J. 3, p. 64-65). At this appointment, only her second with Dr. Saatman, Dr. Saatman's record states that Ms. Hawkins "failed basic conservative treatment," despite noting at the first appointment that she had responded well to conservative treatment. (J. 3, p. 64). In any event, after the procedure Dr. Saatman instructed Ms. Hawkins to return in two weeks for a repeat injection, if necessary, which Ms. Hawkins never did. (J. 3, p. 64).

Not only did Ms. Hawkins not seek additional treatment with Dr. Saatman (despite her recommendation for a series of injections), she also didn't seek treatment with Dr. Leon again until January 4, 2021. Upon her return to treatment with Dr. Leon, she appears to have

undergone treatments with him on five occasions over the course of just two weeks (from January 4, 2021 to January 14, 2021), her most care with Dr. Leon since the first two weeks of treating with him back in April 2017.

Since then, Ms. Hawkins has continued with chiropractic care and testified that she routinely self-treats with a MagnaWave machine and a shock therapy machine that she uses on her horses. (Doc. 54, p. 37, 78, 105).

### C. Mr. Gaugh's Post Accident Medical Care

Mr. Gaugh first visited Dr. Leon at Vida Chiropractic on March 20, 2017, nine days after the accident. (J. 11, p. 546). Dr. Leon diagnosed Mr. Gaugh with cervicalgia; pain in thoracic spine; low back pain; cervicobrachial syndrome; contracture of muscle, multiple sites; sprain of ligaments of cervical, lumbar, and thoracic spine; acute post traumatic headache; myalgia; myositis; neuralgia and neuritis; sleep disorder; segmental and somatic dysfunction of head, cervical, thoracic, lumbar, and pelvic regions. (J. 11, p. 548). Dr. Leon advised Mr. Gaugh to use a cold pack to facilitate healing and symptom management, to use Bio-Freeze for an analgesic effect, and to use a support pillow to aid in the restoration and support of the cervical lordosis. (J. 11, p. 549). Dr. Leon created a treatment plan for Mr. Gaugh to be seen three times a week for four weeks with the short-term goals of 50% reduction in symptoms, 50% reduction of pain, increased ability to perform activities of daily living, decrease inflammation, decrease muscle spasms, and increase active range of motion. (J.11, p. 544, 548).

On March 27, 2017, Mr. Gaugh visited Brandy Wiley, a physician's associate at Axxess Therapy. (J. 8, p. 564-65). She offered Mr. Gaugh trigger point injections and pain

medication, he declined both and stated he would use the natural muscle relaxer recommended by Dr. Leon. (J. 8, p. 565).

Mr. Gaugh began the first two weeks of chiropractic care in March 2017 with three visits, and then proceeded with seven visits in April 2017, seven visits in May 2017, four visits in June 2017, two visits in July 2017, and two visits in August 2017. On August 11, 2017, Dr. Leon noted that Mr. Gaugh had reached maximum medical improvement and was told to come in as needed. (J. 11, p. 490).

One month after the accident, on April 25, 2017, Dr. Leon referred Mr. Gaugh to CareFirst Imaging for an MRI. The impressions stated:

1. C3-4: There is a central disc protrusion type herniation compressing on the thecal sac.
2. C4-5: Disc bulge centrally compressing on the thecal with some bilateral neural foraminal narrowing
3. C5-6: disc bulge centrally compressing on the thecal with some bilateral neural foraminal narrowing
4. C6-7: There is a disc bulge resulting in bilateral neural foraminal narrowing
5. Straightening of the cervical spine curvature
6. Transverse ligament sprain

(J. 21, p.1). The impressions for the lumbar spine stated:

1. L3-4: Disc bulge compressing on the thecal sac with some bilateral neural foraminal narrowing.
2. L4-5: Disc bulge compressing on the thecal sac with some bilateral neural foraminal narrowing.
3. L5-S1: Disc bulge compressing on the thecal sac with some bilateral neural foraminal narrowing.

(J. 21, p. 4-5).

On June 28, 2017, Mr. Gaugh had an orthopedic spinal consultation with Dr. Messer at the International Spine Center. Dr. Messer reviewed Mr. Gaugh's MRI and noted that there was a bulging disk at C3-C4 but no abnormal disk pathology in the lumbar spine. (J. 13,

p. 748). Dr. Messer recommended facet blocks of the cervical spine plus third occipital nerve injections to determine if the C2-C3 joint is causing Mr. Gaugh's headaches, as well as facet blocks in the lumbar spine with radiofrequency neurotomies. (J. 13, p. 748-49). While Dr. Messer was not called to testify at trial, his medical records noted that in his opinion, Mr. Gaugh's "pains and need for treatment have arisen solely and directly as a result of the motor vehicle accident." (J. 13, 748). After this single consultation, Mr. Gaugh did not pursue any additional care with Dr. Messer and did not receive any of the facet blocks Dr. Messer recommended.

After his last visit with Dr. Leon on August 11, 2017, Mr. Gaugh received no chiropractic treatment for a year and seven months, until April 1, 2019. (J. 11, p. 487-492). He did, however, have a consultation with Dr. Widi, a neurosurgeon, on November 21, 2017. (J. 10, p. 552-562). Dr. Widi's medical records note that "the patient's discomfort in his neck and low back has improved; however, he mainly has complaints of occipital headaches more so toward the left with associated neck pain." (J. 10, p. 553). Dr. Widi noted that Mr. Gaugh had only been taking anti-inflammatories on an intermittent basis and recommended that he start a regimen of anti-inflammatories and muscle relaxers as needed. (J. 10 p. 554). Dr. Widi (who did not testify at trial) recommended that if there is no pain relief, Mr. Gaugh could consider a left greater occipital nerve root block as well as trigger point injections and noted that at that time there was no need for any neurosurgical intervention. Dr. Widi noted that Mr. Gaugh should return if there is any worsening or developing pain, and at that time he may require more emergent intervention including an epidural steroid injection or minimally invasive decompression of the cervical and lumbar spine. Dr. Widi referred Mr. Gaugh to Advanced Rehab Specialists for a greater occipital nerve block and trigger blocks in the

cervical spine. (J. 7, p. 585). Mr. Gaugh did not return to Dr. Widi after this initial consultation.

On January 22, 2018, Mr. Gaugh received a bilateral occipital nerve block injection at Advance Rehab Specialists from David Curry, ANRP, which he tolerated well. (J. 7, p. 572). Mr. Curry advised Mr. Gaugh to return in two weeks and informed him that if the injection was effective, they would discontinue treatment, but that if the pain continued, they would try another injection into the occipital bundle. Mr. Gaugh did not return to Mr. Curry for any additional injections.

Over a year after Mr. Gaugh's injection, he returned to Dr. Leon on April 1, 2019. Dr. Leon's treatment notes stated that Mr. Gaugh was in "good health and expected to make good progress and recovery with few residuals." (J. 11, p. 487). Mr. Gaugh returned to Dr. Leon once in May and July 2019, three times in August, twice in September, once in October, then once a month in December 2019, January, February, and March 2020, once in May, once in July, twice in August, once in September, twice in October, and once in November. In 2021, Mr. Gaugh visited Dr. Leon once in January, twice in March, twice in April, once in May, and once a month in June and July. Mr. Gaugh testified that he also takes over the counter medication such as Advil.

### D. Life after the accident

At the time of the trial, Ms. Hawkins was 61 years old and testified that could still ride and train horses for many hours each day, and that her pain depends on how many times a day she must saddle a horse. She testified she can no longer lift bales of hay, grain, or clean the horse stalls and now relies on other boarding facilities to board horses, which she claims has impacted her business.

Mr. Gaugh no longer plays golf and currently works as an exterior pressure washer at his father's company. He works five or six days a week cleaning pool screens, driveways, pool decks, houses, and commercial buildings. He must move trailers, lift hoses, pull hoses, and move an 8–10-gallon pressure washer.

## II.   LEGAL STANDARD

Under the FTCA, the United States is liable for money damages for injury caused by the negligent act of its employees while acting within the scope of their employment. The court must apply the law of the state where the alleged tort occurred. 28 U.S.C. § 1346(b)(1). Because the accident at issue occurred in Florida, Florida law applies. The Government does not dispute liability for the accident; therefore, damages are the only issue.

In Florida, courts follow the "more likely than not standard of causation" and require proof that "defendant's negligence 'probably caused' the plaintiff's injury." *Aycock v. R.J Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) (citing *Cox v. St. Joseph's Hosp.*, 71 So. 3d 795, 799 (Fla. 2011) and *Gooding v. Univ. Hosp. Bldg, Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)). To establish causation where the injuries are not readily observable, expert testimony is necessary. *Perez v. United States*, No. 8:20-CV-769-SPF, 2022 WL 909763, at *8 (M.D. Fla. Mar. 29, 2022) (citing *Ballard v. United States*, No. 3:15-cv-101-J-25MCR, 2017 WL 11630641, at *8 (M.D. Fla. Oct. 5, 2017); *Rementer v. United States,* No. 8:14-CV-642-T-17MAP, 2017 WL 1095054, at *18 (M.D. Fla. Mar. 21, 2017)). A plaintiff's back pain and other soft tissue injuries are not "readily observable" medical conditions. *Id*.

Additionally, Florida law does not permit recovery for non-economic damages unless the negligence caused a permanent injury within a reasonable degree of medical probability or significant and permanent scarring or disfigurement. Fla. Stat. §§ 627.737(2)(b) and (c)

(2022); *Perez*, 2022 WL 909763, at *8 (citing *Eley v. Moris*, 478 So. 2d 1100 1103 (Fla. 3rd DCA 1985)) ("If the threshold requirement of permanent injury is not reached, a court cannot 'award general damages for pain, suffering or any of the other elements of damages set forth in [Fla. Stat] section 627.737(2).'"); *Arias v. Porter*, 276 So. 3d 49, 54 (Fla. 2d DCA 2019) (holding that if a jury finds a plaintiff suffered from a permanent injury it must award past noneconomic damages). However, Florida law requires a fact finder to award damages if a preexisting physical condition is aggravated by an injury, or the injury activates a latent condition. *Tharpe v. United States*, No. 15-CV-21340-UU, 2016 WL 4217863, at *6 (S.D. Fla. Apr. 27, 2016) (citing *C. F. Hamblen, Inc. v. Owens*, 172 So. 694 (Fla. 1937) and Florida Jury Instruction 501.5(a)).

## III.   DISCUSSION

The United States acknowledges that both plaintiffs sustained a minor injury, and it is reasonable for them to have obtained conservative treatment, which they each did. The parties presented competing opinions regarding the cause of both plaintiffs' back and neck pain. Plaintiffs presented the opinions of Dr. Leon, Plaintiffs' treating chiropractor, and Dr. Saatman, Ms. Hawkins' treating neurosurgeon. Defendant presented the opinions of Dr. Kaye, a radiologist, and Dr. Rossenblat, a neurosurgeon. Dr. Kaye and Dr. Rossenblat reviewed Ms. Hawkins' medical records, including her MRIs, X-rays, and CT scans.

"As the fact-finder, the court is 'free to determine the reliability and credibility of expert opinions and, if conflicting, to weigh them as the finder sees fit.'" *Perez*, 2022 WL 909763, at *9 (quoting *Dep't of Ag. & Consumer Servs. v. Bogorff*, 35 So. 3d 84, 88 (Fla. 4th DCA 2010)). However, the court's decision to reject an expert testimony "must be founded on some

reasonable basis in the evidence." *Id.* (quoting *Boyles v. A & G Concrete Pools, Inc.*, 149 So. 3d 39, 48 (Fla. 4th DCA 2014)). A reasonable basis for rejecting expert testimony can include:

> conflicting medical evidence, evidence that impeaches the credibility or basis for an expert's opinion; lack of candor of the plaintiff in disclosing prior accidents, prior medical treatment, and prior or subsequent similar injuries; conflicting lay testimony or evidence that disputes the injury claim; or the plaintiff's overall credibility relating to conflicting statements regarding the alleged injury.

*Id.* (quoting *Boyles*, 149 So. 3d at 48).

"[A] physician may offer lay opinion testimony, consistent with Rule 701, when the opinion is 'based on his experience as a physician and [is] clearly helpful to an understanding of his decision making process in the situation." *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2011). Both Dr. Leon and Dr. Saatman established that their opinions were formed through treating the plaintiffs. "[I]f a treating physician acquired the opinions that are the subject of the testimony directly through treatment of the plaintiff, the treating physician cannot be forced to file a written report required by Rule 26(a)(2)(B)." *Rementer v. United States*, No. 8:14-CV-642-T-17MAP, 2015 WL 5934522, at *5 (M.D. Fla. Oct. 9, 2015). "Because a treating physician considers not only the plaintiff's diagnosis and prognosis, opinions as to the cause of injuries do not require a written report if based on the examination and treatment of the patient." *Id.* Neither of Plaintiffs' treating physicians filed a written report, so any opinions beyond those procured directly from treatment will not be considered. *Id.*

Dr. Leon is a chiropractor with 11 years of experience. He has treated both plaintiffs since the accident. He currently sees approximately 150 to 200 patients per week and estimates that 5-10% of those patients have been involved in car accidents.

Dr. Saatman has been a board-certified neurologist for 15 years. She treated Ms. Hawkins on two occasions, three years after the accident, once for a consultation and once to give her an injection. She currently sees at least a hundred patients on a weekly basis and estimates that 75% of those patients are trauma patients and 25% have degenerative, chronic issues.

Dr. Kaye is a radiologist with 41 years of experience. He is board certified in diagnostic radiology as well as vascular and interventional radiology. He currently works in a clinical setting at a trauma center and teaches at the Florida International University Medical College.

Dr. Rosenblatt is a neurosurgeon with 30 years of experience. He is board certified by the American Board of Neurological Surgery. He is currently the chief of neurosurgery for Anita Health, which is comprised of eight Catholic hospitals in the greater Chicago area, and actively practices at two of the hospitals.

**A. Ms. Hawkins' Injury**

Dr. Leon, Ms. Hawkins' chiropractor, believes she will need chiropractic care 12-24 times a year for the rest of her life because of the accident. Dr. Saatman, the neurosurgeon who saw Ms. Hawkins on two occasions three years after the accident, believes it is likely that Ms. Hawkins will need some type of surgical intervention in the future because of her injuries from the accident. However, the testimony of Dr. Kaye and Dr. Rosenblatt, along with Ms. Hawkins' gaps in chiropractic treatment and lack of follow up with the neurosurgeons who recommended injections, reveal that this level of future care is not reasonably certain to be incurred.

Prior to the accident, Ms. Hawkins claims she had no pain in her neck or back. Now, she complains of pain in her back, neck, and frequent headaches. Notably, the day of the

accident, Ms. Hawkins refused transport to the hospital, choosing instead to go to a chiropractor six days after the accident. Additionally, less than two weeks after the accident, Ms. Hawkins declined trigger point injections to alleviate her pain.

Despite being in pain, Ms. Hawkins did not receive an MRI until two months after the accident. Dr. Rosenblatt testified that he would have recommended traditional evaluation and more immediate imaging studies, as opposed to spinal manipulation which could worsen Ms. Hawkins' condition. Additionally, despite complaining of headaches, Ms. Hawkins never received any imaging studies of her brain, which Dr. Rosenblatt also would have recommended. Dr. Rosenblatt noted that Ms. Hawkins also never had an EMG study, which would have been a useful diagnostic test as it helps to objectify a cervical abnormality.

On February 21, 2018, Ms. Hawkins reported to Dr. Widi that she could still do her job, including the manual labor and heavy lifting. (J. 4, p. 43). Dr. Widi determined that Ms. Hawkins improved significantly with the use of anti-inflammatory muscle relaxers, even though she wasn't taking them on a continual basis. Ms. Hawkins was directed to see Dr. Widi as needed, but she did not return. (J. 4, p. 44).

On May 29, 2018, Ms. Hawkins received a medial branch nerve block injection from Dr. McCollom at C7 on the right side. (J. 5, p. 152). Despite a recommended follow-up for two weeks later, and the recommendation that she receive medial branch nerve block injections at multiple levels and bilaterally, Ms. Hawkins did not return for additional treatment. Ms. Hawkins testified that she sought opinions from different neurosurgeons "to see if [she] could get some kind of relief more than just the surgery right now." Dr. McCollom's records do not reveal that he recommended surgery. And, courses of non-surgical treatments were offered, but she didn't complete them.

On October 29, 2020, three years after the accident, Dr. Saatman administered a single epidural injection for pain in Ms. Hawkins' cervical spine. Ms. Hawkins never returned for a follow up appointment, despite Dr. Saatman recommending she return for a series of three injections. Indeed, this was Ms. Hawkins' last appointment with a specialist. Ms. Hawkins testified that she did not want to take prescription pain medication, and instead managed with Advil, chiropractic care, and self-treated with a MagnaWave machine and shock wave therapy machine that she uses on horses.

Dr. Kaye concluded that Ms. Hawkins' scans showed chronic degenerative changes, boney spurs, and bulging discs, rather than the acute findings listed on impressions of her scans. Dr. Kaye explained that the changes in Ms. Hawkins' spine shown on the initial May 16, 2017 MRI take several years to develop, and couldn't have developed in just the two months since the accident. The MRI of her thoracic spine showed chronic changes of mild degeneration at T1-T2 through T3-T4, which is common in the vast majority of people in her age group. (J. 2, p. 87). Dr. Kaye disagreed with the impressions of the cervical spine MRI listing a disc herniation at the C5-C6 level, instead he believes it shows a broad-based disc bulge with an annular fissure, which is not due to acute trauma but instead due to chronic disc degeneration. (J. 3, p. 74). Dr. Kaye also noted that the first MRI on May 16, 2017 and the second MRI on July 15, 2020 show the same findings, which (as he testified) is further evidence that there are degenerative changes in Ms. Hawkins' spine. Dr. Kaye also reviewed the mammograms taken on May 16, 2017, which revealed no rupture of the saline implants in her breast. He noted that sometimes when there is blunt force trauma, implants such as these can rupture.

Likewise, Dr. Rosenblatt concluded that the MRI taken on May 16, 2017 showed chronic degenerative changes. The cervical images showed varying degrees of mild spondylosis but no evidence of trauma or injury. He noted that there was no spinal cord compression, just mild narrowing, and a chronic condition as opposed to acute. The thoracic images were nearly normal and did not show any evidence of an injury. Dr. Rosenblatt disagreed with Dr. Dare's three-level surgical fusion recommendation in 2017. Notably, Dr. Dare was not called to testify at the trial.

Dr. Kaye reviewed the CT scan of Ms. Hawkins' cervical spine taken on January 30, 2018 and stated that it showed the same long-standing, chronic, degenerative changes, particularly with the bony spurs. He explained that these changes take many years to develop and would not have developed in the mere nine months since the accident. Dr. Kaye indicated that the MRI from July 15, 2020 also revealed bony spurs, which can pinch nerves and cause nerve entrapment. The MRI showed the same annular fissures from the MRI from three years prior, evidencing that the classification of an acute tear was incorrect. Dr. Rosenblatt also concluded the July 15, 2020 MRI showed a worsening of Ms. Hawkins' degenerative changes, yet they were still relatively mild at C5-C6.

Notably, Dr. Kaye stated that although pain can't be objectively tested, Ms. Hawkins had no evidence of trauma attributable to the accident. There was no evidence of swelling, edema, or blood; and it is extremely unusual for someone to have three herniated discs as a result of a single accident.

Both Dr. Kaye and Dr. Rosenblatt concluded that no acute spinal injury was ever revealed, and Ms. Hawkins' spinal conditions are purely degenerative. They both stated that degenerative conditions can become symptomatic after a trauma such as an accident, but it

would not be considered permanent. Dr. Rosenblatt classified her injury as a cervical sprain or strain from the accident, which is generally not permanent and resolves in 3-6 months, and any pain complaints after that point would be from her pre-existing degenerative changes in her spine.

Ms. Hawkins testified that she has continued to train and ride horses for many hours each day, despite the pain she alleges she is in. She did not seek medical treatment right away, instead fshe sought chiropractic care six days after the accident. Two weeks after the accident, she declined the trigger point injection offered to her by Brandy Wiley, P.A. to alleviate her pain. Even her chiropractic treatment with Dr. Leon is sporadic – since the initial few months after the accident, she has had multiple gaps in her treatment.

Aside from Ms. Hawkins' treatment with Dr. Leon, she routinely doesn't return to her doctors after seeking their opinions or follow their recommendations. She never returned to Dr. Widi after she was told to return as needed and told that the use of anti-inflammatory medications and muscle relaxers improved her condition. After receiving a single medial branch nerve block injection from Dr. McCollom, she did not return for any further treatment or the other medial branch nerve block injections he recommended. After receiving a single epidural steroid injection from Dr. Saatman, she never returned for a follow up appointment, despite the recommendation that she receive a series of three injections. Instead, Ms. Hawkins has chosen to treat with Advil, chiropractic care, and a MagnaWave machine and shock wave therapy machine that she uses on her horses at competitions.

Dr. Leon and Dr. Saatman both testified that they believed the accident to be the cause of Ms. Hawkins' injuries, although Dr. Saatman acknowledged that Ms. Hawkins' career training horses is a "physical job." (Doc. 56, p. 54). Notably, Ms. Hawkins only had two

appointments with Dr. Saatman—one for a consultation and one for an injection—over three years after the accident occurred. Indeed, Dr. Saatman testified that the only prior medical record she reviewed was Ms. Hawkins' July 2020 MRI, and relied on the radiologist's report describing changes since the May 2017 MRI. The opinions of Dr. Kaye and Dr. Rosenblatt are very persuasive, considering their experience and review of all of Ms. Hawkins' medical records and images, and the court concludes that Ms. Hawkins has degenerative changes in her spine that became symptomatic after the cervical sprain from the accident.

As Dr. Rosenblatt testified, a cervical strain typically resolves in 3-6 months and is not a permanent injury. However, the Government presented no evidence that Ms. Hawkins ever sought medical treatment for her pain prior to the accident. Additionally, Ms. Hawkins testified that she was still in pain at the time of the trial. Because the cervical sprain caused the degenerative changes in her spine to become symptomatic and she still experiences pain from the aggravation, she suffered from a permanent injury and is entitled to both economic and noneconomic damages. *Tharpe*, 2016 WL 4217863, at *7 (awarding past medical damages and damages for pain and suffering for an aggravation of a pre-existing condition).[3]

Dr. Saatman testified that she believed Ms. Hawkins would likely need some sort of surgical intervention because of her injuries. Based on the testimony of Dr. Kaye and Dr. Rosenblatt, any need for surgery in the future would be for degenerative changes in her spine and not due to a permanent, acute injury caused by the accident. Additionally, Dr. Saatman only saw Ms. Hawkins on two occasions in 2020 and only reviewed the MRI from July 15, 2020, over three years after the accident. Each provider who suggested the possibility of

---

[3] At trial, the Government conceded it was reasonable to award Ms. Hawkins $20,000 in non-economic pain and suffering damages. (Doc. 54, p. 14). However, in the Government's trial brief, it concluded that Ms. Hawkins was not entitled to damages exceeding her past medical bills. (Doc. 62).

surgery, including the only one who testified, Dr. Saatman, discussed only reaching that result after their proposed conservative treatment failed. Ms. Hawkins never completed that conservative treatment—indeed she never returned to Dr. Saatman. Therefore, Dr. Saatman's testimony about Ms. Hawkins' need for surgical intervention is unpersuasive. Ms. Hawkins is not entitled to future medical expenses she might incur from her preexisting degenerative changes in her spine, such as an arthroplasty joint replacement surgery or a surgical fusion. *Tharpe*, 2016 WL 4217863, at *7 (declining to award future medical expenses that might be incurred for a preexisting medical condition).

Additionally, Ms. Hawkins is not entitled to future medical treatment for any type of injection therapy, including an ablation. Only future medical expenses that are reasonably certain to be incurred are recoverable. *Tharpe*, 2016 WL 4217863, at *6. As discussed, Ms. Hawkins declined an injection from Brandy Wiley two weeks after the accident, she never returned to Dr. McCollum for the full set of recommended medial branch block injections at C5, C6, and C7 bilaterally, and she never returned to Dr. Saatman for the series of recommended epidural steroid injections. Therefore, injections, including an ablation, are not reasonably certain to be incurred by Ms. Hawkins. *Fasani v. Kowalski*, 43 So. 3d 805, 812 (Fla. 3d DCA 2010) ("It is a plaintiff's burden to establish that future medical expenses will more probably than not be incurred.") (quoting *Kloster Cruise Ltd. v. Grubbs,* 762 So.2d 552, 556 (Fla. 3d DCA 2000)).

Dr. Leon testified that Ms. Hawkins would need 12-24 chiropractic treatments per year for her injury. However, Ms. Hawkins routinely had large gaps in her treatment with Dr. Leon. The most chiropractic treatment Ms. Hawkins received was in the first four and a half months after her accident, with visits approximately three times a week for the first few weeks,

then slightly more than once a week in May and June, and then less than once a week in July. Dr. Leon then reassessed her on July 28, 2017 and determined that she was approaching maximum chiropractic improvement and could continue treatment as needed. (J. 6, p. 659-661). After this appointment, Ms. Hawkins received no chiropractic treatments in August, September, or October 2017 – a three-month period. Ms. Hawkins returned to Dr. Leon for one visit on November 8, 2017, then didn't return again until January 17, 2018. A month later, she returned for chiropractic treatment on February 21, 2018, but then went almost a full year with no visits until February 7, 2019. She had three visits with Dr. Leon in February 2019, then had two visits a month in March, April, and May 2019, one in June, two in July, one in August, two in September, one in October, and then two in November 2019. Ms. Hawkins then had a two-month gap in chiropractic treatment, then resumed care with Dr. Leon for one visit a month in January, February, and March of 2020. She had another two-month gap in care until resuming care with Dr. Leon in May 2020. Considering these frequent gaps in treatment, Dr. Leon's testimony that Ms. Hawkins would need such frequent chiropractic care is unpersuasive.

As to economic damages, Ms. Hawkins is entitled to the past medical expenses she reasonably incurred, a total of $19,329.73.[4] She is not entitled to any future medical expenses.

As to non-economic damages, Ms. Hawkins is entitled to $35,000 for past pain and suffering. She is not entitled to future pain and suffering damages. Although she claims she is still in constant pain, she has not followed up with her doctor's recommendations and she is still able to train and ride horses for hours on a daily basis. *Tharpe*, 2016 WL 4217863, at *7

---

[4] The parties agreed on this number after adjusting for insurance payments. (Doc. 26).

(declining to award future damages for pain and suffering for an aggravation of a pre-existing condition).

Therefore, Ms. Hawkins is awarded a total of $54,329.73, which includes $19,329.73 in economic damages for her past medical treatment, and $35,000 in non-economic damages for her pain and suffering.

### B. Mr. Gaugh's Injury

Dr. Leon, Mr. Gaugh's chiropractor, believes he will need chiropractic care 12-24 times a year for the rest of his life because of the accident, despite the fact that he didn't receive care for a year and seven months from August 11, 2017 to April 1, 2019, and has had many gaps in treatment since then. Although Mr. Gaugh moved in this period, he did not find a chiropractor in his area despite Dr. Leon testifying that he has asked him if he'd like to refer him to another chiropractor. After the accident, Mr. Gaugh waited until nine days to go to the chiropractor. Mr. Gaugh testified that he did not have any pain prior to the accident, however, throughout his testimony, he lacked a recollection of his treatment for this injury.

Dr. Kaye and Dr. Rosenblatt reviewed Mr. Gaugh's medical records, including the MRI taken on April 25, 2017. Dr. Rosenblatt stated that Mr. Gaugh's cervical spine is "fairly, fairly, fairly close to normal." (Doc. 60, p. 73) Dr. Rosenblatt stated that there was no evidence for the diagnoses of myositis, neuralgia, neuritis, a lesion of the nerve root, plexus, or cervical radiculopathy. He called the diagnoses dubious at best. Dr. Kaye reviewed Mr. Gaugh's April 25, 2017 cervical MRI and concluded there was a very minimal disc bulge with some mild disc desiccation and degeneration at C3-C4, but otherwise it was normal and had no evidence of trauma. In his opinion, the disc desiccation and degeneration existed before the accident. Dr. Leon testified that Mr. Gaugh's headaches could be caused by what he refers

to as a herniated disc putting pressure on the spinal cord. However, Dr. Kaye's opinion was that the minimal disc bulge would not cause pain because it is not pressing on the spinal cord or on nerve roots, and he did not believe this type of bulge would cause headaches. Dr. Kaye disagreed with the impressions noting disc bulges at other levels and a transverse ligament strain. Dr. Rosenblatt also considered the minimal disc bulge at C3-C4 to be unremarkable. Dr. Kaye and Dr. Rosenblatt reviewed the lumbar spine MRI and classified it as a normal study.

Dr. Leon estimated that Mr. Gaugh would need 12-24 chiropractic treatments a year. However, considering the treatment notes from August 11, 2017, where Dr. Leon stated that Mr. Gaugh had reached maximum medical improvement (J. 11, p. 490), and treatment notes from April 1, 2019, where Dr. Leon stated that Mr. Gaugh was in "good health and expected to make good progress and recovery with few residuals" (J. 11, p. 487), together with the fact that Mr. Gaugh went over a year and a half with no chiropractic treatment and had frequent gaps in treatment, Dr. Leon's testimony that he would need such frequent treatments for a permanent injury is unpersuasive.

Mr. Gaugh had no brain scans related to his headache and migraine complaints. Both Dr. Kaye and Dr. Rosenblatt testified that they would have recommended a brain scan if a patient had these types of complaints. There were also no scans of Mr. Gaugh's shoulder, which Dr. Kaye would have recommended considering Mr. Gaugh's complaints of shoulder pain. Additionally, despite being in pain, Mr. Gaugh declined the trigger point injections and pain medication offered to him by Brandy Wiley just a few weeks after the accident. (J. 8, p. 565). Three months after the accident, Dr. Messer recommended facet blocks of the cervical spine plus third occipital nerve injections to determine if the C2-C3 joint is causing Mr.

Gaugh's headaches, as well as facet blocks in the lumbar spine with radiofrequency neurotomies. (J. 13, p. 748-49). Despite Mr. Gaugh's testimony about still having frequent headaches, he never returned to Dr. Messer to pursue any of the recommendations.

Dr. Rosenblatt opined that Mr. Gaugh sustained a cervical sprain or strain from the accident, which should resolve in 3-6 months. Because there is no evidence of a head injury, or any structural abnormalities related to a cervical spine injury, Dr. Rosenblatt opined that any headaches caused by the accident should have resolved within several weeks to three months. Dr. Kaye stated that there was no radiographic evidence of any injury attributable to the accident.

In August 2017, merely five months after the accident, Mr. Gaugh didn't return to Dr. Leon for a year and seven months. He did, however, have a consultation with Dr. Widi, a neurosurgeon, on November 21, 2017. (J. 10, p. 552-562). Dr. Widi referred Mr. Gaugh to receive a greater occipital nerve block and trigger blocks in the cervical spine (J. 7, p. 585), and advised him to return if there was any worsening or developing pain. (J. 10, p. 554). Mr. Gaugh never returned to Dr. Widi. In January 2018, he received a bilateral occipital nerve block injection from David Curry, which he tolerated well. (J. 7, p. 572). Mr. Curry advised Mr. Gaugh to return in two weeks and if the injection was effective, they would discontinue treatment and if the pain continued, they would try another injection into the occipital bundle. Mr. Gaugh did not return to Mr. Curry.

His next appointment with Dr. Leon wasn't until over a year later, in April 2019. Mr. Gaugh's medical visits, along with the testimony of Dr. Kaye and Dr. Rosenblatt, supports the conclusion that Mr. Gaugh suffered from a cervical strain as a result of the accident, which is not considered a permanent injury. Mr. Gaugh is entitled to economic damages for medical

expenses he incurred up to his injection appointment in January 2018. He is not entitled to future medical expenses, because no future care is reasonably certain to be incurred. *Tharpe*, 2016 WL 4217863, at *6. Mr. Gaugh is also not entitled to non-economic damages for pain and suffering. *Perez*, 2022 WL 909763, at *8 ("[U]nder Florida law, there is no recovery for non-economic damages arising from a motor vehicle accident unless the negligence caused a permanent injury within a reasonable degree of medical probability or significant and permanent scarring or disfigurement.).[5]

Accordingly, Mr. Gaugh is awarded $5,722.66 in medical expenses he reasonably incurred up to his injection in January 2018.[6]

### IV.   CONCLUSION

For the reasons discussed above, Ms. Hawkins is awarded a total of $54,329.73 and Mr. Gaugh is awarded a total of $5,722.66.

**DONE** and **ORDERED** in Ocala, Florida on June 14, 2022.

PHILIP R. LAMMENS
United States Magistrate Judge

c. Counsel of Record

---

[5] At trial, the Government concluded it was reasonable to award Mr. Gaugh non-economic pain and suffering damages. (Doc. 54, p. 15-16). Although in the trial brief (Doc. 62) the Government concluded he was not entitled to damages exceeding his total medical bills. Florida law does not permit recovery for non-economic damages unless the negligence caused a permanent injury within a reasonable degree of medical probability or significant and permanent scarring or disfigurement. Fla. Stat. §§ 627.737(2)(b) and (c) (2022); *Perez*, 2022 WL 909763, at *8 (citing *Eley v. Moris*, 478 So. 2d 1100 1103 (Fla. 3rd DCA 1985)) ("If the threshold requirement of permanent injury is not reached, a court cannot 'award general damages for pain, suffering or any of the other elements of damages set forth in [Fla. Stat] section 627.737(2).").

[6] This number is adjusted for the amount paid by insurance, which is identified in the parties' joint pretrial statement. (Doc. 26).